UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY MICHAEL FLINT #248501,                Case No. 2:21-cv-00035

             Plaintiff,                Hon.   Hala Y. Jarbou
                                       U.S. District Judge

   v.

DAWN EICHER, et al.,

             Defendants.
_____/

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

Plaintiff state prisoner Anthony Michael Flint filed this civil rights action pursuant to 42 U.S.C. § 1983.   He alleges that his rights were violated while he was confined at the Kinross Correctional Facility (KCF).

This Report and Recommendation (R&R) addresses the following four motions:

(1) a motion to dismiss or for summary judgment filed by Defendant Corizon Health Inc. (Corizon) (ECF No. 37, which was remanded to the undersigned pursuant to ECF No. 105),

(2) a motion for partial summary judgment filed by Plaintiff (ECF No. 73),

(3) a motion to expand the record with newly discovered information filed by Plaintiff (ECF No. 92), and

(4) a motion for summary judgment filed by the remaining Defendants: Michigan Department of Corrections (MDOC), two Registered Nurses (RNs), Defendants Eicher and Damron, and two Dieticians, Defendants Knack and Wellman, each of whom is also employed by MDOC (ECF No. 94).

The issues addressed in this R&R are based on a relatively long and complicated procedural history.  This story begins on May 26, 2021, when Defendants Eicher, Damron, Knack, Wellman, and the MDOC filed a motion for partial summary judgment arguing that Flint failed to exhaust his administrative remedies against Knack and Wellman prior to filing his complaint, failed to state an ADA claim, and asserting that the official capacity claims against Defendants should be dismissed.  (ECF Nos. 22 and 23.)  About a month later, on June 29, 2021, Defendant Corizon filed a motion to dismiss and for summary judgment, arguing that Flint failed to exhaust his administrative remedies, failed to state a claim against Corizon under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), failed to state an ADA claim, and failed to state a conspiracy claim.  (ECF No. 37.)  Corizon also moved for summary judgment on Flint's state law claims of negligence, gross negligence, and medical malpractice.  (*Id.*)

On November 22, 2021, the undersigned issued a Report and Recommendation that addressed both of these motions.  (ECF No. 59.)  The undersigned recommended that the Court (1) dismiss Dieticians Knack and Wellman, and also Corizon due to Flint's failure to exhaust his administrative remedies, (2) dismiss the MDOC under the Eleventh Amendment, (3) dismiss official capacity claims against RNs Eicher and Damron, (4) dismiss Flint's ADA claims and (5) dismiss Flint's state law claims that arose under the Michigan medical malpractice statute.  (*Id.*)

This recommendation, if adopted, would have resulted in the dismissal of all of Flint's claims except for his Eighth Amendment claims against Eicher and Damron

2

in their individual capacities.   Specifically, as to Defendant Corizon, the R&R recommended that the Court conclude that Flint failed to exhaust his administrative remedies against Corizon.   (*Id.*, PageID.745-746.)   It was also recommended that the Court conclude that Flint failed to properly plead a claim for relief against Corizon under *Monell*, by failing to identify an alleged unconstitutional policy and pattern of conduct by Corizon to deny medical care and treatment to save costs.   (*Id.*, PageID.751-754.)

On January 25, 2022, this Court entered an opinion and order that adopted in part, and rejected in part, the R&R.   (ECF Nos. 66 and 67.) First, the Court determined that Flint did not have an available remedy to exhaust against Defendants Knack and Wellman concerning his need for a special diet for his acid reflux.   (*Id.*, PageID.834-835.)   Thus, the Court rejected the R&R's recommendation to dismiss Defendants Knack and Wellman without prejudice based upon exhaustion. Second, the Court overruled Flint's objection to the conclusion that Corizon was an independent contractor that could not be grieved at the prison and found that Flint had failed to exhaust his claims against Corizon.   (*Id.*, PageID.836.)   Third, the Court concluded that Flint could not state an ADA claim based upon medical treatment from Defendants Eicher and Damron.   (*Id.*, PageID.838.)   Fourth, the Court concluded that Corizon was entitled to dismissal from Flint's ADA claim because it is not a public entity.   (*Id.*, PageID.839.)   Finally, the Court allowed Flint's ADA claim to proceed against the MDOC based upon the allegation that Flint did not receive an ulcer-friendly diet, despite instructions from the Dieticians to avoid

3

certain foods.   (*Id.*)   Flint's conspiracy claims and his state law claims were also dismissed.   (*Id.*, PageID.840.)

To summarize, the Court's order stated that Corizon was dismissed from the case.   (ECF No. 67.)   Flint's official capacity claims against Defendants Eicher, Damron, Knack, and Wellman were also dismissed.   (*Id.*)   And Flint's conspiracy and state law claims were dismissed.   (*Id.*, PageID.842-843.)   The claims that remained were Flint's claims against Defendants Eicher, Damron, Knack, and Wellman under § 1983 in their individual capacities, and his ADA claim against the MDOC.   (*Id.*, PageID.843.)

Those motions and Court decisions took place from May 2021 through January 2022.   But the Court's decisions in January 2022 did not end the litigation regarding dispositive motions.   In February 2022, Flint filed a motion for reconsideration of the Court's decisions (ECF No. 70 (motion seeking reconsideration of the Court's decisions in ECF No. 67.)   Flint followed that motion with a motion for partial summary judgment filed in April 2022.   (ECF No. 73.)   Defendants Eicher, Damron, Knack, Wellman, and the MDOC then filed a motion for summary judgment.   (ECF No. 94.)

On July 22, 2022, this Court granted in part, and denied in part, Flint's motion for reconsideration. (ECF No. 105.)   The Court reinstated Corizon as a Defendant because Flint showed that no administrative process existed that allowed him to submit a grievance against Corizon.   (*Id.*, PageID.1495.)   The Court denied Flint's request to reinstate his State law claims.   (*Id.*, PageID.1496.)   The Court remanded

Corizon's original motion for summary judgment from June 2021 (ECF No. 37) "to the magistrate judge to reconsider the other arguments presented, taking into consideration the non-vacated portion of the Court's January 24, 2022 Opinion." (*Id.*)

The undersigned respectfully recommends that the Court: (1) grant Corizon's motion to dismiss or for summary judgment (ECF No. 37) because Flint fails to make an allegation against any Corizon employee and because Flint fails to support his claim that the MDOC employees he named as Defendants – RNs Eicher and Damron – delayed sending him to the hospital to save Corizon money, (2) deny Flint's motion for partial summary judgment (ECF No. 73), and (3) grant Flint's motion to expand the record with newly discovered evidence (ECF No. 92).

It is further recommended that the Court grant in part, and deny in part, MDOC, RN Eicher, RN Damron, Dietician Knack, and Dietician Wellman's motion for summary judgment (ECF No. 94): by granting Defendants RN Eicher and RN Damron summary judgment because Flint received medical care and treatment but merely disagrees with the medical decisions made by Defendants Eicher and Damron, AND denying summary judgment to the MDOC, Dietician Knack, and Dietician Wellman – because a genuine issue of material fact exists regarding whether Flint was denied a therapeutic diet at the prison.

If the Court accepts this recommendation, the remaining claims will be an ADA claim against the MDOC and Eighth Amendment claims against Defendant Dieticians Knack and Dietician Wellman.

5

## II.  Factual Allegations

In the earlier R&R (ECF No. 59), the undersigned summarized Flint's factual allegations.   (*Id.*, PageID.733-34.)   That summary is included below.

In his amended complaint, Flint says that while he was confined in the Kinross Correctional Facility (KCF) on April 15, 2019, he needed medical attention because he was experiencing shortness of breath, light headedness and black stool.   (ECF No. 16, PageID.235.)   Corrections Officer (CO) Fountain called the prison healthcare office and spoke with Defendant Eicher.   (*Id.*)   When Flint got on the phone, he told Eicher his symptoms, but Eicher stated Flint could not have shortness of breath because he was talking to her.   (*Id.*, PageID.235-36.)   CO Fountain took the phone and spoke with Eicher, and then gave the phone back to Flint.   (*Id.*, PageID.236.)   Eicher told Flint that he did not have a medical emergency and to fill out a kite (a written request for medical care).   (*Id.*)   Flint says that Eicher's response confirms Corizon's custom "that an inmate would have to be near death to receive emergency medical treatment."   (*Id.*)   Flint says that Eicher made no record of his phone call or request for medical care.   (*Id.*)

Flint alleges that, an hour-and-a-half later, he began vomiting blood and collapsed on the floor of his unit.   (*Id.*)   Flint says he was taken to healthcare and treated by Defendant Damron.   (*Id.*)   Flint's initial blood pressure readings were 96/60 and 86/53.   (*Id.*)   Flint stated that he had taken 12 Tums over the past 72 hours.   (*Id.*)   Defendant Damron instructed Flint to fill out another medial kite but to include less detail.   (*Id.*, PageID.236-37.)   Flint's third blood pressure reading was 104/60.   (*Id.*, PageID.237.)   Flint believed that Defendant Damron recorded that reading.   (*Id.*)   Defendant Damron allegedly diagnosed a "bug" and gave Flint more Tums and a liquid diet for two days. (*Id.*)

Later Flint vomited more blood and was taken to War Memorial Hospital where he was diagnosed with acute upper GI bleeding, a duodenal ulcer, acute anemia, H. pylori and a hiatal hernia.   (*Id.*)

When he returned to the prison, Flint requested an "ulcer friendly diet" from Defendant Dieticians Wellman and Knack.   (*Id.*, PageID.241-42.)   Dietician Wellman allegedly responded to this request by stating that "[r]eflux options are available for self selection from the statewide standard menu, no diet order is needed for this." (*Id.*, PageID.242.)   In addition, Flint says that Wellman instructed him to avoid adding spices, pepper, or hot sauce and to avoid tomatoes.   (*Id.*)   Flint claims that most of the meals contain pepper, other spices, or barbecue sauce, and that there is ketchup in the beans.   (*Id.*)   Flint

6

alleges that maintaining a proper ulcer-friendly diet cost him over $3,000.00 for extra food from the prison store and caused him to refrain from eating meals served from the regular prison menu.    (*Id.*, PageID.243.)

## III.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.   Eighth Amendment

### A.   Legal Standards

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.   U.S. Const. amend. VIII.   The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as the failure to provide such care would be inconsistent

with contemporary standards of decency.    *Estelle v. Gamble*, 429 U.S. 102, 103-04

(1976).    The Eighth Amendment is violated when a prison official is deliberately

indifferent to the serious medical needs of a prisoner.    *Id.* at 104-05; *Comstock v.*

*McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a

subjective component.    *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).    To satisfy the

objective component, the plaintiff must allege that the medical need at issue is

sufficiently serious.    *Id.*    In other words, the inmate must show that he is

incarcerated under conditions posing a substantial risk of serious harm.    *Id.*    "[A]n

inmate who complains that ***delay in medical treatment*** rose to a constitutional

violation must place verifying medical evidence in the record to establish the

detrimental effect of the delay in medical treatment to succeed."    *Napier v. Madison*

*Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).    The

Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore*

*v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an
> obvious need for medical care that laymen would readily discern as
> requiring prompt medical attention by competent health care providers.
> *Napier* applies where the plaintiff's "deliberate indifference" claim is
> based on the prison's ***failure to treat a condition adequately***, or
> where the prisoner's affliction is seemingly minor or non-obvious. In
> such circumstances, medical proof is necessary to assess whether the
> delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).    Thus, *Napier* and *Blackmore* provide

a framework for assessing a claim of delayed or inadequate care for a non-obvious

condition:    A plaintiff making this type of claim must place verifying medical

evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk,

9

the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a

10

deliberate indifference claim.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.   *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."   *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."   *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable

to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### B.   RN Eicher and RN Damron (ECF No. 94)

Flint asserts that Defendant RN Eicher refused to provide him treatment when he first informed her of his symptoms over the telephone at 1:15 p.m. on April 15, 2019.   (ECF No. 16 (amended complaint), *see also* PageID.235; ECF No. 95-2, PageID.1262 (Eicher's affidavit, confirming the telephone call).)   Then, Flint asserts that Defendant RN Damron failed to immediately send him to the hospital when he first examined Flint at 2:05 p.m.   (ECF No. 16, PageID.236; *see also* ECF No. 102-1, PageID.1480 (Damron's affidavit, confirming this interaction).)   RN Damron sent Flint to the hospital after he examined him a second time at 4:10 p.m.   (ECF No. 16, PageID.237; ECF No. 102-1, PageID.1480-1481.)

RN Eicher attests that she spoke with Flint over the telephone on April 15, 2019, at 1:15 p.m.   According to RN Eicher, Flint told her that he was not feeling well and that he had dark stools.   (ECF No. 95-2, PageID.1262.)   RN Eicher attests that she did not consider any of Flint's symptoms to be "emergency symptoms that required immediate evaluation or treatment."   (*Id.*, PageID.1262.)   RN Eicher told Flint to kite (write a request) to healthcare for further consideration.   (*Id.*)   Flint says that he complained about "black" stools over three days and not "dark" stools and that RN Eicher told him he "would not die from black stools."   (ECF No. 16, PageID.235-236.)

Approximately 50 minutes later, Flint was examined by RN Damron after Flint had vomited in the housing unit.    RN Damron recorded Flint's blood pressure reading as 96/63.    (ECF No. 95-5 (medical records), PageID.1275.)    RN Damron recorded the visit in a SOAP NOTE:

**Subjective:**
15 minutes ago he stood up and was walking in hallway in his unit and vomited, mostly undigested food but had a slight red tinge, like blood in it. states he didnot eat breakfast today, ate only a hot dog and some water for lunch. For dinner last nigth he has 2 bowls of greens. States he does have a hx of blood in stool off/on for years and also has hx acid indigestion . States 3 days ago he took approx 12 anacid tablets in 24 hrs without much relief, belching/gas continues.

**Objective:**
desk ~ 20-30 feet without incident, gait steady. sits and rises from sitting, laying position without incident, abdomen soft, round, BSx4 hypoactive per ausculatation, no masses noted with light palpation, no rebound tendemess.  lungs CTA, 02 sat 98%@ rm air, RR 18 even/unlabored. ears assessed TMB's grey bil;ateral, no swelling, no redness, + light reflex. Denies any ear pain. Throat pink, swallows without incident, oral/mucous membranes pink, no lymphadenopathy, + belching noted,. Random BS/accucheck= 123.

**Plan:**
increase h20 intake to at least 10 glasses per day   detail issued for clear liquid diet x 48 hrs, lay in/meals in room, kitchen and unit officers notified, OTC anatacid tabs prn for increaased gas, take 2 tabs po q 4 hrs prn. OTC Tylenol 325mg - 2 tabs po q 4 hrs prn for discomfort 12 pkts issued,. RTC 4/17/19 for recheck, sit up at side of bed for 5 minutes before standing.Notify health services if increased sx;s, states understanding,. MP Weist NP notified, agrees with plan.

**Provider: Tara M. Weist NP**

**Document generated by: Joseph B. Damron, RN**

(*Id.*, PageID.1274.)    RN Damron ordered a liquid diet, antacids, Tylenol, and informed Flint to notify health services if symptoms increased.    (*Id.*)    Flint states that RN Damron falsified his medical record by not recording two other blood pressure readings.    (ECF No. 16, PageID.236.)

Approximately two hours later, Flint's symptoms worsened.    (ECF No. 95-5, PageID.1279-1280.)    RN Damron again examined Flint after he had recently vomited.    (*Id.*)    Flint was crying and stated he felt terrible.    (*Id.*)    Flint had chills and was trembling.    (*Id.*)    After RN Damron contacted Nurse Practitioner Weist,

Flint was sent by Emergency Medical Services to War Memorial Hospital for further evaluation.   (*Id.*)

At the hospital it was noted that Flint had "experienced multiple episodes of dark tarry stool as well as coffee-ground emesis."   (ECF No. 95-5, PageID.1284.) Dr. Kyle Raycraft examined Flint when he arrived in the emergency room.   (*Id.*, PageID.1286.)   The medical record indicates Dr. Raycraft's initial assessment of GI bleeding and for the on-call surgeon to be ready for a consult:

> he was evaluated upon arrival in the emergency department.  Initially he was borderline tachycardic. He was started on IV hydration.  Gastric contents were positive for blood and stools were dark and tarry.  With his symptomatology I did started on IV hydration and noted a CBC with an elevated white count and a decreased hemoglobin with no decreased MCV or MCH which is concerning for acute blood loss due to GI bleeding.  He was initially started on 80 mg of Protonix and then an 8 mg protonic strip as well as a Zantac drip.  His heart rate improved with IV hydration.  H. pylori was ordered which was positive.  I did contact our surgeon on-call who agreed to be on consult and admitted to Dr. Samuel for further evaluation and management.

(*Id.*, PageID.1286.)

The next day, April 16, 2019, Flint had an upper GI endoscopy due to the suspected upper GI bleed.   (ECF No. 95-5, PageID.1293-1294.)   The operative report from this procedure revealed that Flint had no active bleeding, but that he did have an ulcer, a small hiatal hernia, an infection, and gastritis.   (*Id.*)   The final impression is shown below.

> **IMPRESSION**
> Duodenitis, gastritis, and a penetrating duodenal ulcer filled with exudate.  No evidence of active bleeding.  Biopsies are pending.  We would keep the patient on acid reduction therapy probably in the form of proton-pump inhibitor for at least four weeks.  If his CLO-test is positive, we would recommend adding double antibiotic therapy for two weeks to clear the H. pylori infection.

(*Id.*, PageID.1294.)

After he returned to the prison, Flint was examined by NP Weist on May 31, 2019.   (ECF No. 95-5, PageID.1295.)   Flint had been taking protonix for a little over

14

6 weeks and he completed treatment for his H. pylori infection.    (*Id.*)    Flint reported feeling epigastric burning in the morning.    (*Id.*)    When Flint requested a low reflux diet, he was advised that he had options to choose low acidic items from the menu and would be referred to the dietician.    (*Id.*)

RNs Eicher and Damron argue that Flint fails to meet the subjective prong of an Eighth Amendment claim because he has not presented verified medical evidence that shows a detrimental effect of the alleged delayed or inadequate treatment. Flint says that when he spoke with RN Eicher, he told her he was having difficulty breathing and was passing black stools.    Flint argues that RN Eicher should have realized that he needed immediate care.    RN Eicher attests that Flint told her that he was not feeling well and that he had dark stools.    (ECF No. 95-2, PageID.1262.) RN Eicher states that Flint did not "describe any symptoms to me that I considered emergencies or in need of urgent care."    (*Id.*)    RN Eicher told Flint to send a healthcare kite and to fully describe his symptoms for further consideration by staff. (*Id.*)

Flint points to two factors that he believes necessitated emergent care.    Flint says that he described black stool and not dark stool, and that he was having breathing difficulties.    (ECF No. 97, PageID.1340.)    Flint says that RN Eicher told him that he was not having breathing issues because he was talking to her and that he would not die from passing black stool.    (ECF No. 16, PageID.236.)

Finally, Flint has argued that "black tarry" stool may be an indication of internal bleeding.    (*Id.*, PageID.238.)    Flint cites to the John Hopkins Complete

Guide to Symptoms & Remedies (2004) as support for this assertion.   (*Id.*)   Flint argues that approximately 50 minutes after he spoke with RN Eicher, he was examined by RN Damron and that RN Damron should have immediately sent him to the hospital based upon the symptoms presented.   (*Id.*, PageID.240.)

RN Damron provided Flint with medical care and treatment.   (ECF No. 95-5, PageID.1274-1280.)   RN Flint examined Flint, placed him on a liquid diet for 48 hours, ordered antacids and Tylenol, and provided instruction to address Flint's gastric issues.   (*Id.*)   When Flint's symptoms worsened approximately two hours later, RN Damron again examined Flint and received approval from the Nurse Practitioner to send Flint to the hospital.   (*Id.*)   Flint was not denied medical care, he simply disagrees with the care that he received and believes that he should have been sent to the hospital sooner.   (*Id.*)   Flint was sent to the hospital approximately three hours after he first spoke with RN Eicher.   (*Id.*)   Flint concedes that his symptoms worsened from the time he first spoke with RN Eicher until he was sent to the hospital.   (ECF No. 97, PageID.1340.)   Flint states that when he first spoke with RN Eicher "[t]his marked the beginning of the rapid decline of the Plaintiff's health . . ."   (*Id.*)

The Sixth Circuit noted that a two-hour delay to provide care for a serious medical condition may constitute deliberate indifference.   *Dominguez v. Correctional Medical Services, Inc.*, 555 F.3d 543, 551 (6th Cir. 2009) (question of fact exists to defeat summary judgment on qualified immunity grounds where nurse failed to immediately provide treatment for serious symptoms of dehydration, and then

allowed the prisoner to return to his non-air-conditioned cube despite the severity of his symptoms).

Flint states that when he told RN Eicher he was experiencing black stool and breathing difficulty, she responded by stating he would not die from black stool and his breathing seemed fine.   RN Eicher informed Flint to kite (write a request) for medical care and to fully explain his symptoms.   Accepting Flint's allegations as true, it was not apparent that he needed urgent care when he first contacted RN Eicher.   Flint concedes that he had not yet vomited and that his symptoms rapidly declined after he spoke with RN Eicher.

More revealing is the fact that Flint was examined by RN Damron approximately 50 minutes later, *after* he vomited.   RN Damron provided treatment, approved by the Nurse Practitioner, which included a liquid diet for 48 hours, antacids, Tylenol, and instructions.   Again, there was nothing to suggest to RN Damron that Flint needed emergent hospital care.   Approximately two hours later, when Flint's symptoms worsened, RN Damron received approval from the Nurse Practitioner to send Flint to the hospital.   Flint was admitted and the next day he received an upper GI endoscopy which revealed a small hiatal hernia, gastritis, and a duodenal ulcer.   Additionally, Flint was positive for an H. pylori infection.

First, in the opinion of the undersigned, Flint has failed to establish that the RNs "disregarded any obvious risk of harm . . . that was within their knowledge." *Patton v. Wilson*, 2:18-cv-170, opinion and order adopting R&R, ECF No. 63, 2020 WL 1501919 (W.D. Mich. Mar. 3, 2020), *affirmed* (ECF No. 78) (6th Cir., November 8,

2021) (affirming summary judgment where alleged delay in diagnosing stomach cancer while providing treatment for minor stomach gastrointestinal issues failed to support the objective or subjective components of an Eighth Amendment claim). Flint has failed to submit verified medical evidence or any relevant admissible evidence that could support a need for urgent medical intervention at the time he first contacted RN Eicher or when he was first examined by RN Damron.   Flint has failed to place any evidence into the record which could possibly support his claim that if RN Eicher sent him to the hospital three hours earlier, or if RN Damron sent him to the hospital two hours earlier, the outcome would have been different.

Second, Flint received care and treatment for his medical condition while at the prison.   Initially, RN Eicher told him to write down his symptoms so healthcare could make an assessment and RN Damron examined and treated Flint's symptoms. After Flint's symptoms worsened, he was sent to the hospital.   Flint's disagreement with the medical treatment that he received fails to support an Eighth Amendment claim against RNs Eicher and Damron.

Accordingly, the undersigned concludes that no genuine issue of material fact exists with respect to Flint's Eighth Amendment deliberate indifference claim against RNs Eicher and Damron.   The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment (ECF No. 94) with respect to RNs Eicher and Damron.

## C.   Dietician Knack and Dietician Wellman (ECF No. 94) and (ECF No. 73)

In his Amended Complaint, Flint asserts that he requested an "ulcer friendly diet." (Amended Complaint, ECF No. 16, PageID.242.) Wellman informed Flint that he could select foods from the standard menu that were less likely to aggravate his acid reflux. (*Id.*) Flint asserted that Wellman and Knack "knew or should have known that the MDOC offered low reflux diets, that would have reduced the risk of a recurring G.I. bleed." (*Id.*) Flint alleges that despite Wellman and Knack's claim that he could self-select appropriate food items from the main menu, most meals contain pepper, onions, and other spices, barbecue sauce, ketchup, and beans. (*Id.*)

Defendants argue that Flint has now changed his claim by asserting that he should have received a reflux diet because he was diagnosed with a hiatal hernia. (ECF No. 103, PageID.1486.) Flint argues that the MDOC Diet Manual indicates that prisoners diagnosed with a hiatal hernia are entitled to a reflux diet. (ECF No. 97, PageID.1347.)

Knack attests that she responded to a request from Flint for a special diet for an ulcer in April of 2019. (ECF No. 95-8, PageID.1323.) She responded that there was not a special diet for someone being treated for an ulcer, and that he should avoid higher acid and spicy foods. (*Id.*)

Wellman attests that she can make recommendations for therapeutic diets, but that she does not have authority to order a therapeutic diet for a prisoner. (ECF No. 95-7, PageID.1315.) Medical providers, which include physicians, physician assistants, nurse practitioners, and dentists, are authorized to order therapeutic

19

diets.   (*Id.*)   Wellman attests that Flint was referred to her by NP Weist in June of 2019.   (*Id.*)   She reviewed his medical history and noted that he was diagnosed "with an acute GI bleed, duodenal ulcer, and H. pylori infection in April of 2019, but no dietary changes were needed."   (*Id.*)   Wellman determined that a special diet was not needed based upon MDOC Bureau of Healthcare Diet Manual which indicates that treating ulcers with therapeutic diets is no longer sound because "peptic ulcers are commonly the result of the long-term use of nonsteroidal anti-inflammatory drugs (NSAIDs) such as aspirin, ibuprofen, and naproxen, or bacterial infection of Helicobacter Pylori (H. Pylori)."   (*Id.*)

Wellman provided Flint with information on ways to reduce indigestion and how he could select a reflux diet from the standard statewide prison menu.   (*Id.*, PageID.1316.)   Wellman further explained that since 2010, a reflux diet is only ordered for MDOC prisoners who cannot self-select reflux options because they are unable to physically attend meals in the chow hall.   (*Id.*)   Finally, Wellman acknowledges that a therapeutic reflux diet is available for prisoners with a medical order, who cannot attend chow hall, based upon a diagnosis of hiatal hernia, esophageal varices, or reflux esophagitis, but not available for prisoners with episodic heartburn, or gastrointestinal ulcer disease in the healing or remission stages.   (Id., PageID.1316-1317.)   Wellman also suggests that if a medically documented prisoner could not obtain adequate nutrition from the standard or therapeutic diets offered by the MDOC, a diet specific to the prisoner's needs would be provided.

20

Wellman states that when she reviewed Flint's medical records, she did not see any indication of a history of hiatal hernia or esophageal problems that required treatment, or evidence that Flint was unable to attend meals in chow hall.   (*Id.*, PageID.1317.)   Wellman also notes that Flint was being treated for his H. pylori infection, which she expected would resolve his ulcer.   (*Id.*)   She disagrees that she told Flint to avoid all foods containing pepper, chili powder, spices, or tomato products.   (*Id.*)   Finally, she indicates that she instructed Flint regarding self-selecting a reflux diet, the choices he can make, and further indicated that prisoners who self-select the "Healthy Choice Options" are advised to avoid ordering foods through the prison store.   (*Id.*)

Flint argues that because he was diagnosed with a hiatal hernia, he should have received a therapeutic diet based upon the MDOC Diet Manual.   The manual provides as follows:

> **PURPOSE:**  The reflux diet described in this manual was created for prisoners who have hiatal hernia, esophageal varices, and/or reflux esophagitis who may require elimination of foods which cause a decrease in lower esophageal pressure and/or have an irritating effect on the esophageal mucosa.
> NOTE: not indicated for episodic heartburn.
>
> **INDICATED USES:**  The reflux diet may be indicated in cases of hiatal hernia, esophageal varices, and/or reflux esophagitis where symptoms have not been controlled using other lifestyle modifications and an adequate trial of pharmaceutical intervention, necessitating a restriction on foods which cause a decrease in the lower esophageal sphincter pressure and/or have an irritating effect on the esophageal mucosa.  Weight reduction if needed is encouraged as well as smoking cessation and compliance with antacids.  Overeating and eating before bedtime is discouraged.  The reflux diet is not indicated in cases of gastrointestinal ulcer disease in the healing or remission stages, acute gastritis or other gastrointestinal diseases.  The diet does not restrict roughage or fiber and should not be used when residue control is desired.

(ECF No. 82-3, PageID.1073.)

As shown above, the manual indicates that a reflux diet **may** be appropriate for a hiatal hernia that is not under control.   The manual does not indicate that in all instances of hiatal hernia a reflux diet will be ordered.   In Flint's case, there are no medical records that indicate that his small hiatal hernia required further treatment.

Flint further argues that Wellman perjured herself by stating in her affidavit that Flint never contacted her again about his diet concerns after June of 2019. Flint states that after he filed this lawsuit in 2019, he contacted Wellman about his diet concerns in June of 2022, just days before she signed her affidavit.[1]   First, a fair reading of Wellman's affidavit (ECF No. 95-7) makes it clear that she was attesting to the relevant time prior to the date that Flint filed his complaint.   Second, Flint's point does not create a genuine issue of material fact.   Although Flint may have contacted Wellman a second time in June of 2022, this contact has nothing to do with the decision Wellman made in June of 2019.

The final diagnosis that Flint received upon discharge from the War Memorial Hospital – shown below – was (1) acute GI bleed, (2) Duodenal Ulcer, and (3) H. pylori infection:

---

[1]    The original complaint filed in the Eastern District of Michigan is dated December 26, 2019.   (ECF No. 1-1, PageID.23.)

**Final Diagnoses (list all):** 1) Acute GI bleed.  2) Duodenal Ulcer.  3) H.Pylori Infection
**HPI and Hospital Course:**
This is a 45-year-old male who presents emergency room chief complaint of acute GI bleed.  Patient was admitted to the hospital as he was found to be anemic.  Hemoglobin and she was 10.  Patient was started on Zantac and Protonix drip.  Upon reassessment, hemoglobin was 7.5.  Patient had an EGD that was performed and showed a DR no ulcer.  No bleeding diatheses.  Patient was also found H pylori positive.  Was started on oral antibiotics at this time.  Of antibiotics is for 14 days.  At time of discharge.  Patient is not orthostatic vital signs are stable.

**1) GI bleed:** status post EGD secondary to duodenal ulcer. 2/2 by H.Pylori infection

**2) Anemia:** Secondary to GI bleed. ) H. pylori infection.  Patient is discharged home on treatment for H. pylori, diabetes, advanced.  Vitals are stable.  No need for acute blood transfusion. s/p 1 UNIT of transfusion.

**3) H. pylori infection:**  Discharged on 14 days of antibtiotics.

**4) Duodenal Ulcer:** Continue with antiacids for 4 weeks

**4) Prophylaxis** Venodyne's.

5) Total time of patient is 35 minutes half the bedside.

**6) Consult.** Surgical consult for EGD and colonoscopy

(ECF No. 82-2, PageID.1008.)

Flint's hospital discharge instructions, signed by a doctor, indicated that he

should continue with a regular diet:

**Discharge Disposition:** Prison/Police Custody
**Discharge Diet:** Regular
**Activity:** As tolerated
**Prescriptions:**
**New**
 Amoxicillin [Amoxil] 1,000 mg PO BID 14 Days  capsule
 Clarithromycin [Biaxin] 500 mg PO BID 14 Days  oralsyr
 Omeprazole [PriLOSEC] 40 mg PO BID 28 Days  capsule.dr

**Continued**
 Sodium Chloride [Saline Nasal Spray] 1 spray BOTH NOST TID PRN
  PRN Reason: Congestion
**Additional Instructions:** Please take your oral antibiotics for a total of 14 days.  Please take antiacid tablets for a total of 28 days.

<Electronically signed by Bensson V Samuel MD>        04/16/19 1344

(ECF No. 82, PageID.1017.)

These factors are not, however, dispositive on the issue of whether the regular diet at the prison provided Flint with appropriate food choices for his medical condition.   It is undisputed that Defendants Knack and Wellman could recommend a therapeutic diet for Flint if the regular diet and self-selection was insufficient for Flint.

Flint says that he cannot meet his needs for a reflux diet by choosing food items from the regular meal.   Flint has stated that the low-reflux diet is the vegan diet offered by the prison, which contains barbeque sauce, ketchup, black pepper, chili powder, garlic, onions, and oranges, and is often too spicy causing aggravation of his medical symptoms.   (ECF No. 73, PageID.871.)   Flint says that he had to incur over $6,000.00 in prison store food purchases to supplement the meals he could eat from the regular diet.   (*Id.*)   Flint admits that he occasionally purchases spicy foods from the prison store, but states he washes the spice off before he eats the food items.   (*Id.*, PageID.872.)

This Court has already determined a question of fact exists on Flint's allegation "that the state-wide menus for the MDOC contain many of the foods and spices he was told to avoid, so he was unable to obtain the 2,600 calories per day that he was entitled to."   (ECF No. 66, PageID.839 (Opinion, addressing Defendants' request to dismiss ADA claim).)   Flint was prescribed medication to reduce stomach acid and continues to take that medication.   (ECF No. 73, PageID.873 (Flint's motion for partial summary judgment).)   Flint presented medical evidence that shows that as of August 25, 2021, he continued to receive medical treatment for his "long [history]

of GERD [gastroesophageal reflex disease] symptoms (ECF No. 74-7, PageID.912), and hospital records from September of 2021 showing a history of GERD with "multiple episodes of gastroesophageal reflux" observed during study:

```
IMPRESSION:
1. Small sliding-type hiatal hernia, only seen when patient was laid flat.
2. Gastroesophageal reflux to the level of the cervical esophagus.
3. Otherwise, unremarkable upper GI series. No gross abnormality of the swallowing
mechanism given patient complaint of dysphagia.
Patient Name: FLINT , ANTHONY MICHAEL                    Medical Record #: 0002258765
Exam Date:    Sep 8 2021 9:30AM                                  XR GI SERIES
                        DIAGNOSTIC Department Page 1 of 2
                                                    248501
```

(ECF No. 74-8, PageID.915.)

Flint says the Court should grant him summary judgment against Defendants MDOC, Wellman, and Knack due to their failure to provide him with a medically necessary diet.   (ECF No. 73.)   Flint argues that Defendants Knack and Wellman instructed him to avoid certain foods, but the regular menu fails to provide him enough other options to sustain his daily calorie requirements.   (ECF No. 74-8, PageID.875.)

In the opinion of the undersigned, a genuine issue of material fact exists regarding whether Flint has shown that he had a medical need for a special diet, and, if so, whether Defendants Knack and Wellman were deliberately indifferent to that a medical need by failing to recommend Flint for a medically appropriate diet. Accordingly, the undersigned respectfully recommends the Court deny Defendants' motion for summary judgment (ECF No. 94) with respect to Defendants Knack and Wellman AND deny Flint's motion for partial summary judgment (ECF No. 73).

## V.  MDOC – ADA claim (ECF No. 94)

The MDOC argues that it did not violate the ADA by failing to provide Flint

his requested special diet.   Flint argues that the MDOC violated the ADA by not

providing him with an appropriate diet.   Flint requested "an ulcer friendly diet" or

"special diet" and says that the food available off the regular menu did not meet his

medical needs.   (ECF No. 16, PageID.242, 245.)   Flint says that he was forced to

purchase foods from the prison store that met his dietary needs.   (*Id.*, PageID.242-

243.)   Flint concedes, as argued by Defendants, that some of the foods he has

purchased contained spices, but he says he could wash off the spices and that he

traded some of the purchased food items with other prisoners.   (ECF No.73,

PageID.872.)

Title II of the ADA provides, in pertinent part, that no qualified individual

with a disability shall, because of that disability, "be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." *Mingus v. Butler*, 591 F.3d 474, 481–82 (6th Cir. 2010) (citing 42

U.S.C. § 12132).   In order to state a claim under Title II of the ADA, Flint must show:

(1) that he is a qualified individual with a disability; (2) that defendants are subject

to the ADA; and (3) that he was denied the opportunity to participate in or benefit

from defendants' services, programs, or activities, or was otherwise discriminated

against by defendants, by reason of plaintiff's disability.  *See Tucker v. Tennessee*,

539 F.3d 526, 532–33 (6th Cir. 2008); *see also Jones v. City of Monroe*, 341 F.3d 474,

477 (6th Cir. 2003).  The term "qualified individual with a disability" includes "an individual with a disability who, with or without...the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs).  The proper defendant under a Title II claim is the public entity or an official acting in his official capacity.  *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002).

This Court has determined that Flint's request for a special diet to maintain 2,600 calories per day and to avoid spicy foods stated an ADA claim.  (ECF No. 66, PageID.838.)  The Court stated:

> Here, Plaintiff argues that he "was denied the opportunity to participate in the activity of MDOC's meal program because of his disability." (Pl.'s Obj. to R&R, PageID.764.)  The Court is not persuaded that Plaintiff's request for a special diet is a request for medical treatment; rather, Plaintiff's request for a diet appropriate for his condition was a request for a reasonable accommodation to allow him to participate in the MDOC's meal service.  *See, e.g., Brooks v. Colo. Dep't of Corrs.*, 715 F. App'x 814, 819 (10th Cir. 2017) (concluding that Brook's request for a special meal pass because of his ulcerative colitis was not "invoking the [ADA] to complain about his medical care"; he was "claiming a failure to provide adequate accommodations to allow the same access to services, programs, and activities that are available to prisoners without disabilities").
>
> . . . Plaintiff has alleged that he requested an ulcer friendly diet after he was diagnosed with "acute upper GI bleeding, a duodenal ulcer, acute

anemia and H-pylori," "and a hiatal hernia" in April of 2019. (Am. Compl., ECF No. 16, PageID.237.)  While there is no suggestion that this diagnosis contains a per se disability, Plaintiff has also alleged that his condition was continuing into March of 2021, almost two years later. (*Id.*, PageID.242.) This is sufficient to show that his physical impairment was not transitory.   Further, he has alleged that Defendant Wellman told him to avoid certain foods, but would not put in a diet order for him. Plaintiff alleged that the state-wide menus for the MDOC contains many of the foods and spices he was told to avoid, so he was unable to obtain the 2,600 calories per day that he was entitled to.    Because eating is a major life activity, Plaintiff has alleged sufficient facts in his complaint to state an ADA claim.

(ECF No. 66, PageID.838-839.)

Based upon this Court's prior decision, and as set forth above, a genuine issue of fact exists regarding whether the regular MDOC meal provides Flint with an adequately nutritious diet available for his medical condition.   Flint argues that reflux diet meals are not available from the regular prison menu.   Flint has set forth sufficient evidence that creates a genuine issue of material fact whether he is being provided an appropriate diet by the MDOC for his medical condition.

## VI.    Corizon (ECF No. 37 on remand pursuant to ECF No. 105) and (ECF No. 92.)

The Court initially dismissed Flint's ADA claim against Corizon (ECF No. 66, PageID.839), Flint's conspiracy claims against Corizon (*id.*, PageID.840), and his state law claims (ECF No. 105, PageID.1495-1496).   When Flint filed his Amended Complaint, he alleged that each of the named Defendants were either MDOC or Corizon employees.   (ECF No. 16, PageID.234.)   Each Defendant has filed an affidavit indicating that they are employed by the MDOC.   (ECF Nos. 95-2, PageID.1261 (Eicher); 95-7, PageID.1314 (Wellman); 95-8, PageID.1322 (Knack);

28

102-1, PageID.1479 (Damron).)   No named Defendant was employed by Corizon. Flint did not assert in his amended complaint that he had any interaction with any Corizon employee.

Arguably, an Eighth Amendment claim could exist against Corizon based upon Flint's assertion that Corizon has a policy of denying medical care to save money.   In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to Section 1983 actions for alleged constitutional violations, albeit in a narrow set of circumstances.   "A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, '*solely* because it employs a tortfeasor.'"   *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).   Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).

In a municipal liability claim, the finding of a policy or custom is the initial determination to be made.   *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–509.

"The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).    Similarly, the delivery of health care by a private provider to state prisoners pursuant to a contract with the state constitutes actions under color of state law for purposes of Section 1983.    *West v. Atkins*, 487 U.S. 42, 57 (1988).  As a result, a *Monell* claim would be equally applicable against Corizon.  And this Court has applied *Monell* liability to contract health care providers like Corizon.  *See*, *e.g.*, *Nobles v. Quality Correctional Care of Michigan, et al.*, No. 1:21-CV-199, 2021 WL 1827077, at *5 (W.D. Mich. May 7, 2021) (stating that "Corizon, like a governmental entity, may be held liable under § 1983 if it actually caused the constitutional deprivation").

To prove a deliberate indifference claim against Corizon, Flint must show that "through its deliberate conduct, [Corizon] was the 'moving force' behind the injury alleged."  *Allman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  He must prove that Corizon had a "policy or custom" that caused a violation of her rights.  *Monell*, 436 U.S. at 694.

A successful *Monell* claim can rest on one of four different theories of liability: (1) a clear and persistent pattern of unconstitutional conduct by contractor's employees, (2) Corizon's notice or constructive notice of the unconstitutional conduct, (3) Corizon's tacit approval of the unconstitutional conduct, such that its deliberate

30

indifference in its failure to act can be said to amount to an official policy of inaction, and (4) that the policy of inaction was the moving force of the constitutional deprivation.   *Winkler*, 893 F.3d at 902.

Flint assumes that Corizon was somehow involved in the alleged denial of Flint's medical care and dietary issues.   Fatal to such an argument, however, would be the apparent fact that Corizon was not involved in the asserted denial of medical care, or with the food provided by the prison.   None of the named Defendants are Corizon employees and Flint has failed to establish that he had any interaction with someone who worked for Corizon.

In addition, assuming that Corizon was involved in Flint's asserted denial of medical care or treatment, Flint completely fails to present relevant, reliable, or admissible evidence that could show that Corizon maintains a policy of denying necessary medical care to save money.   Flint asserts that his medical care was delayed and that he was denied treatment to save Corizon money.   Flint fails to support this claim with relevant evidence.

Flint filed a motion to expand the record with newly discovered evidence. (ECF No. 92.)   Flint submitted the affidavit of Charles Pugh, M.D., who was the Corizon Site Medical Director in 2013 and 2014 at the Chatham County Jail in Savannah Georgia.   The affidavit was used in a case arising in the State of Oregon. Dr. Pugh attested that he felt pressure to minimize emergency room treatments and outside physician consults for jail inmates to save money.   (ECF No. 92-1, PageID.1230.)   This affidavit fails to present relevant evidence in this case because

Dr. Pugh, does not attest to the circumstances at KCF, nor does he attest that he ever worked at KCF.  (*Id.*)   The affidavit was executed on January 20, 2015, and discussed policy at an Oregon County Jail between 2013 and 2014.  (*Id.*)   Flint's complaint involved medical care and treatment at KCF in 2019.  (*Id.*)   In the opinion of the undersigned, Dr. Pugh's affidavit fails to provide relevant evidence which could support Flint's claim against Corizon.

Flint relies solely upon the conduct of Defendant MDOC employees Eicher and Damron to establish his claims against Corizon.   Flint alleges that Eicher and Damron, by delaying his transport to the hospital for approximately three hours after he first began complaining of intestinal issues, showed that there was a Corizon custom or policy to save money.   (ECF No. 16, PageID.244.)   However, a plaintiff cannot rely upon one incident to claim that a custom or policy exists to impose liability on Corizon.   *Jordon v City of Detroit*, 557 F. Appx 450, 457 (6th Cir. Feb. 21, 2014), *citing City of Oklahoma City v. Tuttle*, 417 U.S. 808, 823-24 (1985).   In the opinion of the undersigned, Corizon should be dismissed from this case.

### VII.   Qualified Immunity (ECF No. 94)

Defendants RN Eicher, RN Damron, Dietician Knack, and Dietician Wellman argue that they are entitled to qualified immunity because they did not violate Flint's clearly established constitutional rights.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'"  *Phillips v. Roane Cty.*, 534 F.3d

531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Once a defendant raises the qualified immunity defense, the burden shifts to the

plaintiff to demonstrate that the defendant officer violated a right so clearly

established "that every 'reasonable official would have understood that what he [was]

doing violate[d] that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   The analysis entails a two-step

inquiry.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

First, the court must "determine if the facts alleged make out a violation of a

constitutional right."  *Id.*  (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).

Second, the court asks if the right at issue was "'clearly established' when the event

occurred such that a reasonable officer would have known that his conduct violated

it."  *Id.*  (citing *Pearson*, 555 U.S. at 232).   A court may address these steps in any

order.  *Id.*  (citing *Pearson*, 555 U.S. at 236).   A government official is entitled to

qualified immunity if either step of the analysis is not satisfied.  *See Citizens in*

*Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must

identify "the specific constitutional right allegedly infringed" and determine whether

a violation occurred.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).   The court

considers the state of the law at the second step.    As the Supreme Court has

observed, "this Court's case law does not require a case directly on point for a right to

be clearly established, [but] existing precedent must have placed the statutory or

constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).   As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable

cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

In the opinion of the undersigned, for the reasons stated above, Defendants RN Knack and RN Damron are entitled to qualified immunity, because no genuine issue of fact exists from which a reasonable jury could determine that these Defendants were deliberately indifferent to Flint's medical needs.   It is recommended that the Court deny qualified immunity to Defendant Dieticians Knack and Wellman because, as stated above, Flint has presented sufficient evidence to establish that a genuine issue of material fact exists on whether these Defendants violated his Eighth Amendment rights by failing to recommend him for a therapeutic diet.

## VIII.   Recommendation

It is recommended that the Court grant Corizon's motion to dismiss or for summary judgment (ECF No. 37), deny Flint's motion for partial summary judgment (ECF No. 73), and grant Flint's motion to expand the record with newly discovered evidence (ECF No. 92).

It is further recommended that the Court grant in part, and deny in part, MDOC, RN Eicher, RN Damron, Dietician Knack, and Dietician Wellman's motion for summary judgment (ECF No. 94): by granting Defendants RN Eicher and RN Damron summary judgment AND denying summary judgment to the MDOC, Dietician Knack, and Dietician Wellman.

If the Court accepts this recommendation, the remaining claims will be an ADA claim against the MDOC and Eighth Amendment claims against Defendant Dieticians Knack and Dietician Wellman.

NOTICE TO PARTIES:    Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.    28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).    Failure to file timely objections constitutes a waiver of any further right to appeal.    *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).    *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    December 19, 2022                     /s/ *Maarten Vermaat*
                                                                MAARTEN VERMAAT
                                                                U.S. MAGISTRATE JUDGE