UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY MICHAEL FLINT,

       Plaintiff,

                                    Case No. 2:21-cv-35

v.

                                    Hon. Hala Y. Jarbou

DAWN EICHER, et al.,

       Defendants.

_____/

## OPINION

Plaintiff Anthony Michael Flint is a state prisoner incarcerated at the Kinross Correctional

Facility (KCF).  Flint asserts federal law claims under 42 U.S.C. § 1983 for deliberate indifference

in violation of his Eighth Amendment rights and under the Americans with Disabilities Act (ADA).

On December 19, 2022, the magistrate judge issued a Report and Recommendation (R&R)

addressing four pending motions (ECF No. 122).  The R&R recommended that the Court: (1) grant

Defendant Corizon Health, Inc.'s (Corizon) motion for summary judgment, or in the alternative,

to dismiss (ECF No. 37)[1]; (2) deny Flint's motion for partial summary judgment (ECF No. 73);

(3) grant Flint's motion to expand the record with newly discovered evidence (ECF No. 92); and

(4) grant in part and deny in part Defendants Michigan Department of Corrections (MDOC), Dawn

---

[1] The magistrate judge previously issued an R&R addressing this motion and recommended that the Court grant
Corizon's motion (ECF No. 59), which the Court did (ECF No. 67).  Flint subsequently filed a motion for
reconsideration (ECF No. 70), which the court granted in part and denied in part (ECF No. 105).  The Court reinstated
Corizon as a Defendant because Flint had demonstrated that no existing administrative process allowed him to submit
a grievance against Corizon.  However, the Court denied Flint's request to reinstate his state law claims.  The Court
remanded Corizon's motion for summary judgment, or in the alternative, to dismiss to the magistrate judge to
reconsider the other arguments presented.

Eicher, Joseph Damron, Jessica Knack, and Kelly Wellman's motion for summary judgment (ECF No. 94).

Before the Court are Knack, Wellman, and MDOC's objections to the R&R (ECF No. 123), as well as Flint's objections to the R&R (ECF No. 124).  Corizon's successor, Tehum Care Services, Inc., filed for bankruptcy protection on February 13, 2023, so the case against Corizon is automatically stayed.  (*See* Suggestion of Bankruptcy & Notice of Automatic Stay, ECF No. 131.)   Because of the stay, the Court will address the R&R and objections solely as to Defendants Eicher, Damron, Knack, Wellman, and MDOC.  The Court will not address any claims against Corizon.

## I. FACTUAL BACKGROUND

On April 15, 2019, Flint requested medical attention because he was experiencing shortness of breath, light headedness, and black stools.  (Am. Compl. ¶ 14, ECF No. 16.)  At approximately 1:15 p.m., a corrections officer called Eicher, a registered nurse in the prison healthcare office.  (*Id.* ¶ 15; MDOC Tel. Log, PageID.1267.)  After Flint expressed his concerns and requested immediate medical aid, Eicher allegedly stated that Flint could not have been experiencing shortness of breath because Flint was talking to her.  (Am. Compl. ¶¶ 16-17.)  Because Flint did not describe any symptoms that Eicher believed required immediate care, she told Flint to send a kite (a written request for medical care) to be evaluated in-person.  (Eicher Aff., ECF No. 95-2, PageID.1262.)

At 2:05 p.m., Damron, also a registered nurse in the prison healthcare office, received a call because Flint had vomited in his housing unit.  (Am. Compl. ¶ 21; MDOC Tel. Log, PageID.1267.)  During Damron's subsequent in-person examination, Flint indicated that his vomit had a slight red tinge to it, like there was blood in it. (Pre-Hosp. & Hosp. Med. Recs., ECF No. 95-5, PageID.1274.)  Flint also said that he has had blood in his stool on-and-off for years and that he

2

had taken approximately twelve antacid tablets in the past twenty-four hours without much relief. (*Id.*)  Damron observed Flint walk with a steady gait as well as sit and lay without incident.  (*Id.*) Damron also recorded Flint's blood pressure at 96 over 63.  (*Id.*, PageID.1275.)  Based upon his examination, Damron ordered Flint to be on a clear liquid diet for the next 48 hours, to eat his meals in his cell, to drink at least ten glasses of water daily, to sit up for five minutes before standing up from a laying down position, and to take antacid tablets as well as Tylenol as needed. (*Id.*, PageID.1274, 1276.)  Tara Weist, another nurse practitioner, agreed with the plan.  (*Id.*, PageID.1274.)

Approximately two hours after Flint returned to his housing unit, he vomited blood again. (Am. Compl. ¶ 28.)  An ambulance was called at 4:25 p.m.  (Pre-Hosp. & Hosp. Med. Recs., PageID.1280.)  At 4:29 p.m., Flint's blood pressure was 98 over 68.  (*Id.*, PageID.1279.)  The ambulance transported Flint to the Chippewa County War Memorial Hospital.  At 5:16 p.m., a hospital physician saw Flint and started him on an IV drip, Protonix, and a Zantac drip because he was borderline tachycardic.  (*Id.*, PageID.1268.)  The following day, on April 16, 2019, after an upper GI endoscopy, Flint was diagnosed with a duodenal ulcer, gastritis, and an Helicobacter Pylori (H. Pylori) infection.  (*Id.*, PageID.1293.)

On April 20, 2019, after returning to KCF, Flint filed a kite requesting an ulcer-friendly diet.  (Flint Dep. 54, ECF No. 95-6; Kite Resp. & Wellman Mem., ECF No. 16-6, PageID.259.) On April 22, 2019, Knack, a registered nurse,[2] responded to the kite and noted that "[t]here is no special diet for someone being treated for an ulcer[.]  Avoid high acid and spicy foods."  (Kite Resp. & Wellman Mem., PageID.259; *see also* Knack Aff., ECF No. 95-8, PageID.1323.)  This was the only interaction Flint had with Knack regarding his diet.  (Flint Dep. 54.)

---

[2] Knack is a registered nurse.  The R&R mistakenly refers to Knack as a dietician.

On May 31, 2019, Flint had a follow-up visit with Weist. At that time, Flint had completed his treatment for the H. Pylori. (Discharge & Post-Discharge Med. Recs., ECF No. 82-2, PageID.1021.) He denied having any abdominal pain, blood in his stool, or diarrhea, and he reported only occasional epigastric burning. (*Id.*) Weist ordered a dietary consult. (*Id.*, PageID.1296.)

Wellman, a registered dietician, received this referral on June 10, 2019, reviewed Flint's medical record, and concluded that "[r]eflux options are available for self[-]selection from the statewide standard menu, no diet order is needed for this." (Kite Resp. & Wellman Mem., PageID.257.) Wellman reached this conclusion based on current nutrition standards of care for the management of ulcers and the MDOC Bureau of Healthcare Services Diet Manual, which states that peptic ulcers are commonly the result of either the long-term use of nonsteroidal anti-inflammatory drugs (NSAIDS) or bacterial infection of H. Pylori, not a person's diet. (Wellman Aff., PageID.1315.) Wellman also attached information on how to select a reflux diet from the standard menu, which suggested choosing apple juice instead of orange juice at breakfast, choosing the non-tomato entrée at lunch and supper, and not adding *additional* spices, pepper or hot sauce to his food. (Kite Resp. & Wellman Mem., PageID.258 (emphasis added).)

Flint claims that most of the meals on the standard menu include pepper, onions, barbecue sauce, ketchup, and other spices. (Am. Compl. ¶ 53.) To avoid these ingredients, Flint alleges he spent over $3,000 for extra food from the prisoner store and did not eat his recommended 2,600 calories per day. (*Id.* ¶ 55.)

## II. LEGAL STANDARDS

### A. Review of Objections

Under Rule 72 of the Federal Rules of Civil Procedure,

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment."  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### C. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or

her actions to violate a person's constitutional rights.'"  *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). Government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Id.*  This legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him."  *Id.* at 590.

"While the defendant 'bears the burden of pleading' a qualified immunity defense, '[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'"  *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)).  "[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

## III. ANALYSIS

### A. Eighth Amendment Claim

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison personnel to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  The Eighth Amendment is violated when prison personnel are deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

6

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  Where, as here, the claim is based in part on an unreasonable delay in treatment, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment[.]"  *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires a plaintiff to show that the officials had "a sufficiently culpable state of mind" in denying or delaying medical care.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  To prove a defendant's knowledge, "[a] plaintiff may rely on circumstantial evidence . . .: A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Rhinehart v. Schutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 105.

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical

mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotation marks omitted).  Thus, differences in judgment between an inmate and medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Darrah v. Krisher*, 856 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical care."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *see also Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 488 (6th Cir. 2014).  "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell v. Hininger*, 533 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Flint alleges that Eicher, Damron, Knack, and Wellman were deliberately indifferent to his medical needs in violation of the Eighth Amendment.  With respect to this claim, the R&R recommended granting summary judgment to Eicher and Damron and denying summary judgment to Knack and Wellman.  Flint objects to the latter recommendation, and Knack and Wellman object to the former.

### 1. Eicher and Damron

The R&R concluded that Eicher and Damron are entitled to summary judgment because Flint failed to establish that they disregarded an obvious need for urgent medical care.  With respect to the objective prong, the R&R correctly found that there is no evidence demonstrating that, had Eicher or Damron sent Flint to the hospital two or three hours earlier, the outcome would have been different.  "[W]here the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious . . . medical proof is necessary to assess whether the delay caused a serious medical injury."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004) (citing *Napier*, 238 F.3d at 742).  Flint argues that his verified complaint and medical records demonstrate that "it is more likely than not that he would not have lost as much blood if he had been taken to the hospital earlier."  (Pl.'s Objs. to R&R, ECF No. 124, PageID.1629.)

However, there is no medical evidence that the few hours in between his complaints to Eicher and Damron and his hospitalization exacerbated Flint's condition.  On April 15, 2019, the emergency room physician evaluated Flint upon his arrival and started him on an IV drip, Protonix, and a Zantac drip.  (Pre-Hosp. & Hosp. Med. Recs., PageID.1286.)  Flint was seen by Dr. Kim McCollugh, the on-call surgeon, the next day, April 16, 2019.  This one-day delay suggests that the consult and procedure was not emergent.  Dr. McCollough initially suspected that Flint was suffering from upper GI bleeding "most likely peptic ulcer disease" or a "possible duodenal ulcer." (*Id.*, PageID.1291.)  During the upper endoscopy, however, Dr. McCollough found "no evidence of active bleeding."  (*Id.*, PageID.1293.)  Flint's argument that he would not have lost as much blood had he been taken to a hospital two or three hours earlier is unsupported by the available evidence.

9

Flint further avers that "even a lay-person would have recognized the need for emergency attention" when an individual presented with black stools, difficulty breathing, and vomiting. (Pl.'s Objs. to R&R, PageID.1626-1627.) Even if the Court accepts Flint's argument that this claim "falls under the obviousness line of decisions," Flint fails to satisfy the subjective prong. *Blackmore*, 390 F.3d at 398; *see also Phillips v. Tangilag*, 14 F.4th 524, 537 (6th Cir. 2021) ("We have held that obviously serious problems such as the *Blackmore* prisoner's sharp stomach pain and vomiting over two days—do not require this evidence." (citing *Blackmore*, 390 F.3d at 893)). To satisfy the subjective prong, Flint must show that "each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rinehart*, 894 F.3d at 738 (quoting *Comstock*, 273 F.3d at 703). This is a "high bar[.]" *Id.* at 739.

Eicher's only contact with Flint consisted of a telephone conversation where Flint complained of difficulty breathing and black stools. Eicher believed that Flint did not describe any symptoms that she considered to be emergencies. (*See* Eicher Aff., PageID.1262.) Accordingly, she advised him to fill out a kite to receive an in-person evaluation. (*Id.* ("Under MDOC policy, prisoner healthcare kites are collected daily by healthcare staff and triaged as soon as possible, bu[t] typically no later than a day.").) Eicher could not have conducted a physical examination, taken vital signs, or performed other investigatory tests over a telephone. There is no evidence demonstrating that Eicher was subjectively aware that Flint could have a duodenal ulcer, gastritis, or other serious gastrointestinal issues based on this short telephone conversation.

Approximately two hours later, Flint vomited in his housing unit, and Damron conducted an in-person evaluation. Damron ordered Flint to be on a clear liquid diet for the next 48 hours, to eat his meals in his cell, to drink at least ten glasses of water daily, to sit up for five minutes

before standing up from a laying down position, and to take antiacid tablets as well as Tylenol as needed. (Pre-Hosp. & Hosp. Med. Recs., PageID.1274, 1276.) During the evaluation, Flint stated that he has had blood in his stool on-and-off for years. (*Id.*, Page.ID.1274.) But Flint does not have a history of ulcers. (*Id.*, PageID.1279, 1291.) Based on this evidence, the Court cannot infer that Damron '*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm.'" *Rhinehart*, 894 F.3d at 739 (quoting *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018)). Rather, Flint merely disagrees with the initial course of treatment taken by Damron. After Flint's condition further deteriorated hours later, Damron called for an ambulance. (Pre-Hosp. & Hosp. Med. Recs., PageID.1281.) In sum, even if Flint can satisfy the objective prong, his claim against Eicher and Damron fails on the subjective prong.

Finally, Flint argues that the magistrate judge "inappropriately credit[ed] Defendant Eicher's affidavit over Plaintiff's sworn Complaint." (Pl.'s Objs. to R&R, PageID.1627.) According to Flint, he told Eicher that he had been having black stools and difficulty breathing. (Am. Compl. ¶ 33, 35.) According to Eicher, Flint told her that he was not feeling well and had been experiencing dark stools. (Eicher Aff., PageID.1262.) This factual dispute does not change the outcome of the analysis above. And, contrary to Flint's objection, the R&R recognized that Flint had been having black stools and difficulty breathing and explicitly wrote:

> Accepting Flint's allegations as true, it was not apparent that he needed urgent care when he first contacted RN Eicher. Flint concedes that he had not yet vomited and that his symptoms rapidly declined after he spoke with RN Eicher.

(R&R 17.)

In sum, the Court will overrule Flint's objections to the R&R as they relate to the Eighth Amendment claim against Eicher and Damron. Both Defendants are entitled to summary judgment on this claim. Because there is no genuine dispute of material fact as to whether Eicher

11

and Damron violated Flint's Eighth Amendment rights, they are also entitled to qualified immunity.

### 2. Knack and Wellman

The magistrate judge found that a genuine dispute of material fact exists as to whether Flint had a medical need for a special diet, and, if so, whether Knack and Wellman were deliberately indifferent to this need by not recommending Flint for the therapeutic reflux diet.  (R&R 25.) Knack and Wellman object to this finding and argue that they are entitled to summary judgment because Flint has not made a showing under either the objective or subjective prong.

Flint has not demonstrated a serious medical need as required by the objective prong. Flint's April 16, 2019, hospital discharge summary indicated that Flint should pursue a "regular" diet.  (Discharge & Post-Discharge Med. Recs., PageID.1017.)  The hospital physicians did not recommend a therapeutic diet as part of Flint's treatment.  Nor is this an obvious condition that any layperson would agree necessitates a therapeutic diet.

Instead, Flint is challenging the adequacy of the care provided by Knack and Wellman. "Objectively speaking, this care qualifies as 'cruel and unusual' only if it is 'so grossly incompetent' or so grossly 'inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'"  *Phillips*, 14 F.4th at 535 (quoting *Rhinehart*, 894 F.3d at 737).  To avoid "turning the Eighth Amendment into a federal malpractice statute," proving grossly inadequate care requires a prisoner to introduce medical evidence, "typically in the form of expert testimony." *Id.* (citing *Rhinehart*, 894 F.3d at 737, 740-43; *Napier*, 238 F.3d at 742).

Knack and Wellman's care was not grossly inadequate such that it shocks the conscience. Flint's discharge paperwork indicated that he should proceed with a regular diet.  Flint took it upon himself to request a therapeutic diet.  On April 20, 2019, Flint wrote a kite requesting an ulcer-friendly diet to which Knack responded that "[t]here is no special diet for someone being treated

12

for an ulcer[.] Avoid high acid and spicy foods."  (Kite Resp. & Wellman Mem., PageID.259.)

During a follow-up appointment with Weist on May 31, 2019, Flint requested a reflux diet, and

she referred him to Wellman, a dietician.  (Discharge & Post-Discharge Med. Recs., PageID.1021.)

On June 10, 2019, Wellman reviewed Flint's medical records and noted that "[t]herapeutic diet

modifications are not provided for ulcer management, as the ulcer should be resolved with

eradication of the H Pylori bacteria" and encouraged Flint to "self select the reflux options

available on the regular line."[3]  (Id., PageID.1023.)

 Both Knack and Wellman appear to be following the criteria listed in the MDOC Diet

Manual.  According to the Manual,

> [t]he reflux diet may be indicated in cases of hiatal hernia, esophageal varices,
> and/or reflux esophagitis where symptoms have not been controlled using other
> lifestyle modifications and an adequate trial of pharmaceutical intervention,
> necessitating a restriction on foods which cause a decrease in the lower esophageal
> sphincter pressure and/or have an irritating effect on the esophageal mucosa.

(MDOC Diet Manual, ECF No. 82-3, PageID.1073.)  It is "not indicated in cases of gastrointestinal

ulcer disease in the healing or remission stages, acute gastritis or other gastrointestinal diseases."

(Id.)  At the time Knack and Wellman treated Flint in 2019, he had been treated for a potential GI

bleed, a duodenal ulcer, and an H. Pylori infection.  (Discharge & Post-Discharge Med. Recs.,

PageID.1008.)  Flint had been prescribed antiacids for his ulcer, which suggests that it was in the

healing stage.  When describing her findings during the upper endoscopy at the hospital, Dr.

McCollough also indicated that Flint had "some minimal gastritis in the mid and proximal

stomach."  (Pre-Hosp. & Hosp. Med. Recs., PageID.1293.)  The MDOC Diet Manual also does

not recommend a reflux diet for cases of acute gastritis.

---

[3] Before 2010, an inmate seeking a reflux-friendly diet was required to receive a medical order for the therapeutic reflux diet.  (Wellman Aff., PageID.1316.)  In 2010, MDOC made reflux-friendly options part of the standard menu while maintaining the therapeutic reflux diet in the Diet Manual.  (Id.)

Flint argues that his "request for a reflux diet was made after [he] was diagnosed, (but not treated) with a hiatal hernia." (Pl.'s Resp. in Opp'n to Knack, Wellman & MDOC's Objs. to R&R, ECF No. 129, PageID.1658.)  Dr. McCollough noted that Flint had "a small hiatal hernia that is the sliding-type hernia at the EG junction." (Pre-Hosp. & Hosp. Med. Recs., PageID.1293.) However, as the R&R noted, a therapeutic reflux diet *may* be appropriate for a hiatal hernia, but the MDOC Diet Manual does not require it. (R&R 22.)  Moreover, Flint's discharge summary indicated that he had "no tenderness, organomegaly, masses, or hernia." (Discharge & Post-Discharge Medical Records, PageID.1017.)  It also did not list a hiatal hernia as one of Flint's final diagnoses. (*Id.*, PageID.1008.)  Rather, the hospital recommended that Flint proceed with a regular diet and did not order treatment for a hiatal hernia.

Additonally, only inmates who suffer from one of the listed conditions in the MDOC Diet Manual *and* are physically unable to attend meals in the chow hall may receive an order for the therapeutic reflux diet. (Wellman Aff., PageID.1317.)  Flint has not suggested that he was unable to eat meals in the chow hall. (*Id.*)  Knack and Wellman were following MDOC recommendations. Their care was not grossly inadequate.

Finally, proving grossly inadequate care requires Flint to introduce sufficient medical evidence.  As medical evidence, Flint provides his 2021 medical records.  On August 25, 2021, a post-evaluation clinical encounter indicated that Flint has a long history of gastrointestinal reflux disease ("GERD") symptoms. (8/25/2021 Clinical Encounter, ECF No. 47-7, PageID.912.)  An X-ray from September 8, 2021, found a small hiatal hernia. (9/8/2021 Imaging Rec., ECF No. 74-8, PageID.915.)  Flint's subsequent medical encounters and diagnoses demonstrate that he continued to suffer from gastrointestinal and reflux-related issues.  However, such medical evidence does not demonstrate that these conditions and diagnoses would have been any different

had Knack and Wellman ordered the therapeutic reflux diet in 2019.  Rather, it requires the Court to assume that Flint continued to suffer from these issues in 2021, in part or in whole, because Knack and Wellman failed to order the therapeutic reflux diet in 2019. In short, this evidence does not "describe[e] what a competent [medical professional] would have done and why the chosen course was not just incompetent but grossly so."  *Phillips*, 14 F.4th at 536.

Flint also provides evidence to support his argument that the standard menu does not provide sufficient alternatives to sustain his daily caloric requirements while following Knack and Wellman's instructions.  The Court previously found that Flint alleged sufficient facts in his amended complaint to support an ADA claim, one of those facts being that Flint could not obtain 2,600 calories per day while following Knack and Wellman's instructions to avoid certain foods. (1/24/2022 Op., ECF No. 66, PageID.839.)  However, the Rule 56 standard for summary judgment is more demanding than the Rule 12(b)(6) standard for failure to state a claim.  This is especially true in this context where Flint must provide medical evidence to support his Eighth Amendment claim that the care he received from Knack and Wellman was grossly inadequate.  Flint provides a written statement from another inmate which states that "[o]n April 19-2021 during our breakfast meal the hash was inadequate for human consumption due to the overpowered pepper taste that this meal had and therefore had to be thrown out."  (4/19/2021 Inmate Statement, ECF No. 74-5.) Flint also provides undated food logs tracking his daily caloric intake.  (Food Logs, ECF Nos. 74-12, 74-13.)  However, the Court cannot discern how Flint approximated the number of calories in each food item or whether it is accurate.  This evidence is insufficient to support Flint's claim that Knack and Wellman's care was grossly inadequate because it deprived him of his caloric requirements.

Even if Flint could demonstrate that he had a serious medical need, he cannot satisfy the subjective prong.  To succeed on this prong Flint must demonstrate that Knack and Wellman "(1) 'subjectively perceived facts from which to infer substantial risk to the prisoner,' (2) 'did in fact draw the inference,' and (3) 'then disregarded that risk.'"  *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (quoting *Comstock*, 273 F.3d at 703).  There is no evidence suggesting that Knack and Wellman subjectively believed that Flint needed the therapeutic reflux diet to avoid a significant risk of serious harm and disregarded this risk.  At no time did either Knack or Wellman believe that Flint required the therapeutic reflux diet or that eating off the standard menu would pose a risk to Flint's health.  (*See* Knack Aff., PageID.1323; Wellman Aff., PageID.1318.)  There is also no evidence suggesting that Knack or Wellman believed that the reflux-friendly options on the standard menu would deprive him of his caloric requirements.  Indeed, Wellman attests that Flint requires approximately 2,450 calories per day and that selecting the reflux-friendly options on the standard menu would still provide him with more than 2,500 calories per day.  (Wellman Aff., PageID.1318.)

No genuine disputes of material fact exist with respect to either the objective or subjective prong.  Knack and Wellman are entitled to summary judgment on Flint's deliberate indifference claim.  The Court will sustain Knack and Wellman's objections and overrule the R&R as it relates to this claim.  Because there is no genuine dispute of material fact as to whether Knack and Wellman violated Flint's Eighth Amendment rights, they are also entitled to qualified immunity.

### B. ADA Claim

Flint brings an ADA claim against the MDOC for failing to provide him with his requested special diet.  Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, because of that disability, 'be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'"  *Mingus v.*

*Butler*, 591 F.3d 474, 481-83 (6th Cir. 2010) (quoting 42 U.S.C. § 12132).  In order to establish a claim under Title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that defendant is subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of plaintiff's disability.  *See Tucker v. Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008); *see also Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).  The Supreme Court has held that Title II applies to state prisons and inmates.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998).

A person is disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [has] a record of such an impairment; or [is] regarded as having such an impairment."  42 U.S.C. §§ 12102(2)(A)-(C).  This impairment must "substantially limi[t] the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(ii).  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The ADA does not apply to impairments that are transitory and minor, and those are generally impairments "with an actual or expected duration of 6 months or less."  *Id.* § 12102(3)(B).

There are two relevant objections regarding the ADA claim.  First, the MDOC objects to the R&R's recommendation that the claim survives summary judgment.  Specifically, the MDOC argues that Flint has not provided any evidence that his medical conditions require a special diet.  (Knack, Wellman & MDOC's Objs. to R&R, ECF No. 123, PageID.1619.)  Instead, the MDOC argues that Flint has only asserted his "own belief" that he requires a special diet.  (*Id.*)  Second,

Flint objects to the R&R's recommendation that this Court deny his motion for summary judgment. Flint argues that he has a long history of GERD and duodenal ulcers; that the MDOC knew about his GERD and prescribed him medicine for this condition for over three years; that medical evidence supports treating symptoms of GERD with a special diet; and that the MDOC failed to make reasonable accommodations to its standard menu so he could fully participate in the meal program and meet his caloric requirements.  (Pl.'s Objs. to R&R, PageID.1634-1636.)

At issue is whether Flint's gastrointestinal issues qualify as a disability under the ADA.  In 2019, Flint suffered from potential GI bleeding, gastritis, a duodenal ulcer, and H. Pylori.  (Pre-Hosp. & Hosp. Med. Recs., PageID.1293.)  An upper endoscopy also revealed a small hiatal hernia.  (*Id.*)  Flint's medical records demonstrate that as of 2021, Flint still had a small hiatal hernia.  (9/8/2021 Imaging Rec., PageID.915.)  He also has a history of GERD.  (8/25/2021 Clinical Encounter, PageID.912.)  At least some of these conditions have persisted for nearly two years, which suggests that they are not transitory.  However, "'[m]erely having an impairment does not make one disabled for purposes of the ADA[.]'"  *Koch v. Thames Healthcare Grp., LLC*, 855 F. App'x 254, 258 (6th Cir. 2021) (quoting *Toyota Motor Mgf., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002)).  Flint must demonstrate that these impairments substantially limited his ability to perform a major life activity, in this case, eating.

The MDOC argues that Flint has not provided any evidence that these medical conditions were the result of, or could be treated by, his diet.  It appears that Flint's H. Pylori infection, which was treated with antibiotics upon his discharge from the hospital, caused his duodenal ulcer.  (Wellman Aff., 1317.)  Flint's 2019 hospital records also indicated that he should proceed with a regular diet despite his GI bleeding, duodenal ulcer, H. Pylori, and small hiatal hernia.  (Discharge

18

& Post-Discharge Med. Recs., PageID.1017.)   Flint provides no evidence suggesting these
conditions should be treated or ameliorated through diet changes.

Flint cites to the American Journal of Nursing for the proposition that "'[c]ertain diet and
lifestyle choices can help to attenuate the symptoms of GERD.'"   (Pl.'s Objs. to R&R,
PageID.1635 (quoting Andrea Barton, *Gastroesophageal Reflux Disease*, 101 AM. J. OF NURSING
24AA, 24EE (Oct. 2001)).  Such changes include avoiding chocolate, highly acidic foods (such as
citrus and tomato juice), and dairy products.  (*Id.*)  In contrast, the MDOC Diet Manual relies on
the treatment recommendations for GERD from the American Journal of Gastroenterology.  (*See*
MDOC Diet Manual, PageID.1076 (citing Kenneth R. DeVault & Donald O. Castell, *Updated
Guidelines for the Diagnosis and Treatment of Gastroesophageal Reflux Disease*, 94 AM. J.
GASTROENTEROL. 1434-1442 (1999).)  The 2022 guidelines for the diagnosis and management of
GERD in the American Journal of Gastroenterology state that the quality of evidence supporting
the proposition that avoiding "trigger" foods controls GERD symptoms is "low."  Philip O. Katz,
et al., *ACG Clinical Guideline for the Diagnosis and Management of Gastroesophageal Reflux
Disease*, 117 AM. J. GASTROENTEROL. 27, 34 (2022).  Common diet and lifestyle changes include
"cessation of foods that potentially aggravate reflux symptoms such as coffee, chocolate,
carbonated beverages, spicy foods, acidic foods such as citrus and tomatoes, and foods with high
fat content."  *Id.*  However,

> [s]upporting data for these recommendations are limited and variable, often
> involving only small and uncontrolled studies, and rarely as the only intervention,
> making interpretation and definitive recommendations difficult.

*Id.*  In sum, the medical evidence appears to be inconclusive.

Even if Flint could demonstrate that GERD substantially limits his ability to eat (a major
life activity), he has not shown that the standard diet cannot accommodate his impairment.  The
ADA requires public entities to make "'reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]'" *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020) (quoting 28 C.F.R. 35.130(b)(7)(i)).  When assessing this ADA claim under a Rule 12(b)(6) standard, the Court found that Flint had alleged sufficient facts to state a claim.  (*See* 1/24/2022 Op., PageID.839.)  Now, after the parties have had the opportunity to conduct discovery, the Court must assess whether the available evidence creates a genuine dispute of material fact pursuant to Rule 56.

There is no genuine dispute of material fact as to whether the standard menu can accommodate Flint's impairment.  Wellman provided Flint with information on how to select a reflux diet on the standard menu:

1. Choose apple juice instead of orange juice at breakfast.
2. Choose the non tomato entrée (which may be regular or vegetarian) at lunch and supper.
3. Do not add additional spices, pepper, or hot sauce to your food.
4. Avoid carbonated or caffeinated beverages (soda, coffee, cola)[.]
5. Choose fruit instead of higher fat desserts.
6. Eat 3 meals per day, do not skip meals.
7. Avoid bedtime snacks, because they increase acid production at night.

(Kite Resp. & Wellman Mem., PageID.258.)  The MDOC recommendation instructs Flint to avoid *additional* spices, pepper, and hot sauce, not to avoid them entirely.  According to Wellman, choosing these reflux-friendly options on the standard menu still provides inmates with approximately 2,500 calories per day—Flint requires approximately 2,450 calories per day. (Wellman Aff., PageID.1318.)  As evidence that he could not meet his caloric requirements while choosing these reflux-friendly options on the standard menu, Flint provides the Court with undated food logs tracking his daily caloric intake.  (*See* Food Logs.)  However, the Court cannot discern how Flint approximated the number of calories in each food item or whether the caloric calculations are accurate.  This evidence is insufficient to create a genuine dispute of material fact that Flint's impairment required an accommodation not already available to him.

In sum, MDOC is entitled to summary judgment on the ADA claim.  The Court will sustain

MDOC's objection and overrule the R&R as it relates to this claim.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Knack, Wellman, and MDOC's

objections and deny Flint's objections.  The Court will grant summary judgment to Eicher,

Damron, Knack, and Wellman on Flint's Eighth Amendment claim of deliberate indifference.  The

Court will also grant summary judgment to MDOC on Flint's ADA claim.  An order will enter

consistent with this opinion.


Dated: March 28, 2023                                    /s/ Hala Y. Jarbou
                                                         HALA Y. JARBOU
                                                         CHIEF UNITED STATES DISTRICT JUDGE